415 So.2d 174 (1981)
Jessie L. CARTER
v.
AVONDALE SHIPYARDS, INC.
No. 80-C-2903.
Supreme Court of Louisiana.
November 16, 1981.
On Rehearing May 17, 1982.
Rehearing Denied July 2, 1982.
Stewart E. Niles, Jr., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant-applicant.
David Gertler, of Gertler & Gertler, New Orleans, James L. Donovan, of Donovan & Lawler, Metairie, for plaintiff-respondent.
LEMMON, Justice.
This is a dispute between successive employers over liability for workmen's compensation benefits due plaintiff on account of total and permanent disability caused by silicosis.
Plaintiff was employed by Dibert, Bancroft & Ross (DBR) as a sand mixer from 1940 to 1968, working daily with materials which can cause silicosis. Plaintiff left DBR in 1968 and began working for Avondale Shipyards, Inc. in essentially the same type of employment.
In 1972 plaintiff's doctor determined that he had contracted silicosis. Plaintiff continued working until 1977, when he left his employment because his condition had become totally disabling.
Plaintiff then filed this suit against Avondale, who began paying benefits and filed a third party demand against DBR. The trial court found plaintiff was totally and permanently disabled, but dismissed Avondale's third party demand, finding that the evidence failed to establish plaintiff had contracted silicosis while employed by DBR.[1]
While Avondale's appeal was pending, plaintiff and Avondale executed a court-approved compromise. The court of appeal then affirmed the denial of the third party demand by a divided vote in an unpublished opinion.
We granted certiorari to review that judgment. 396 So.2d 887 (La.).

I.
Although plaintiff worked in the presence of silica flour (ground sand) and silica dust during his entire term of employment at DBR, he was not furnished with a respirator during the early part of that employment. *175 However, the hopper into which sand was loaded for transfer to the mixing container had a closed top, except for a two-foot opening for introduction of sand.
At Avondale plaintiff also worked as a sand mixer after the first year, but the hopper had an open top and had to be tilted to empty the sand into the mixing containe. In this regard plaintiff testified that there was more visible dust in the air at Avondale.
No medical evidence was available as to plaintiff's condition prior to 1972.[2] In that year plaintiff consulted Dr. Brown, who ordered X-rays and referred plaintiff for lung function evaluation. Although the test showed some lung impairment, Dr. Brown advised plaintiff to continue working. Plaintiff consulted Dr. Brown periodically, and in 1976 the doctor noted progressive changes compatible with silicosis. In 1977 Dr. Brown advised plaintiff to discontinue working because of the disabling disease.
At trial Dr. Brown testified that the described exposure at DBR was consistent with and could contribute to the development of silicosis.
Dr. Weill, a specialist in occupational lung diseases, testified that the induction time for silicosis is variable, depending on the dose, but that in present day foundry work the induction time is generally 20 to 40 years. He noted that it would be very unusual for a foundry worker to develop silicosis after only ten years, stating the induction time is "generally much longer". He concluded that the major causal factor of plaintiff's silicosis diagnosed in 1972 was the 28 years of exposure at DBR and that it was a "very low order probability" that the later heavy variable doses after plaintiff's 28 years of exposure was the primary causative factor.

II.
Analyzing the evidence, the court of appeal suggested the conclusion that it was more probable than not that the development of silicosis occurred to some extent during plaintiff's employment at DBR. However, the intermediate court concluded that the trial judge's contrary factual finding was not clearly wrong.
Sufficiency of evidence is a question of law, not of fact. In civil cases the essential elements of the claim, including causation, must be proved by a preponderance of the evidence. The evidence is sufficient to constitute a preponderance when the proof, taken as a whole, establishes that the fact or causation sought to be proved is more probable than not. Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972).
When, as here, there is no dispute in the evidence, the trial court does not truly perform a credibility function, and without resolving conflicts in proof the trial court simply determines as a matter of law whether the fact or causation at issue was shown to be more probable than not. On appellate review in such cases the manifest error rule is not applicable, since there was no determination of credibility or weighing of conflicting evidence by the trial court.[3] The reviewing court simply applies the same "more probable than not" standard to the undisputed record evidence and determines as a matter of law whether the evidence is sufficient to constitute a preponderance.
On reviewing the record, we agree with the court of appeal that the undisputed evidence shows, more probably than not, that the continuing exposure to silica dust during plaintiff's 28 years of employment at DBR was a substantial causative factor *176 in his development of the occupational disease of silicosis. Indeed, the record undeniably establishes that the exposure at Avondale, substantially similar or only slightly worse than the exposure at DBR, could not alone have caused the silicosis when it was diagnosed four years after he began working at Avondale. Nevertheless, the evidence also preponderates to establish that the exposure at Avondale was likewise a substantial causative factor.
We therefore conclude that the work conditions during plaintiff's employment at both DBR and Avondale substantially contributed to plaintiff's ultimate disability from occupational disease. The lower courts erred in reaching contrary conclusions on this record.

III.
The question of the respective liability of successive employers, when conditions during the terms of each employment are substantial causative factors in the employee's gradual development of an occupational disease, has not been extensively presented to Louisiana courts. R.S. 23:1031.1, pertaining to occupational diseases, does not address the question.[4]
Some states assign liability to the employer for whom the claimant was working at the time the disease became disabling, if that employment contributed to the development of the disease.[5] This "last injurious exposure" approach has the desirable feature of being definite, but it is basically unfair when conditions in one or more previous employments substantially contributed to the development of the disease. Such an approach also might induce initial employers to discharge not yet disabled employees who have been exposed to conditions favorable to development of occupational diseases or might discourage other employers from hiring persons who have formerly worked under such conditions.
Other states apportion the liability among employers whose conditions of employment have contributed substantially to the disabling disease. See generally 4 A. Larson, Workmen's Compensation, Section 95.00 et seq. (1981). See also Maynard v. State Workmen's Compensation Comm'r, 239 S.E.2d 504 (W.Va.1977); Colonial Ins. Co. v. Industrial Acc. Comm'n, 29 Cal.2d 79, 172 P.2d 884 (1946), codified, Cal.Labor Code, § 5500.5 (West 1971).
In Louisiana a former employer has been held liable when the term of employment with the second employer was so brief as to be deemed non-causative. Hanlon v. Sline Indus-Painters, 358 So.2d 700 (La.App. 3d Cir. 1978), cert. denied, 360 So.2d 1177. Nevertheless, even when the length of the second employment is sufficient to support a finding that the second employment was a causative factor in the development of the occupational disease, there is no compelling reason that the former employer should not remain liable when that former employment has been proved substantially causative of the developmental disease.
Although each case must be decided on its own facts and circumstances, we conclude that apportionment should be applied when such a result achieves fundamental fairness. In the present case, as noted earlier, the conditions of employment during plaintiff's work with both employers substantially contributed to the development of silicosis and to his ultimate disability. We accordingly hold that the liability for compensation benefits should be apportioned between those two employers. Since the employers have agreed upon the method of apportionment, it is not necessary to decide that issue in this case.[6]
*177 For these reasons the judgments of the lower courts on the third party demand are reversed, and judgment is now rendered granting the third party demand. Costs in the trial court are assessed in equal proportions to defendant and third party defendant. Costs in both appellate courts are assessed to third party defendant.
WATSON, J., concurs in the result.
MARCUS, J., dissents and assigns reasons.
BLANCHE, J., dissents for reasons assigned by MARCUS, J.
MARCUS, Justice (dissenting).
Workmen's compensation liability for an employee's occupational disease or personal injury is most frequently assigned to his employer at the time of the most recent exposure or injury bearing a causal relationship to the disability. 4 A. Larson, Workmen's Compensation Law, § 95.00 et seq (1981). I consider this to be a better result than that reached by the majority in this case. Accordingly, I respectfully dissent.

ON REHEARING
DIXON, Chief Justice.
Jessie L. Carter sued Avondale Shipyards, Inc., his employer from 1968 to 1977, for workman's compensation, claiming disability from silicosis, an occupational disease under R.S. 23:1031.1. Avondale answered, alleging that it had begun paying compensation to Jessie Carter. Assuming the position of third party plaintiff, Avondale claimed that Dibert, Bancroft & Ross, Inc., plaintiff's employer before 1968, caused or aggravated Jessie Carter's silicosis. Avondale claimed indemnification or contribution from Avondale for compensation benefits paid and to be paid to Carter. Dibert, Bancroft & Ross denied Avondale's allegations.
After trial there was judgment for plaintiff against Avondale for compensation benefits, penalties, attorney's fees and medical expenses; there was a finding that plaintiff's silicosis was not "contracted while employed by the third party defendant," Dibert, Bancroft & Ross, and a judgment rejecting Avondale's demands against Dibert, Bancroft & Ross.
There was a judgment in March of 1980 approving a compromise settlement and payment of Carter's January, 1980 judgment against Avondale.
Avondale appealed and the Court of Appeal, in an unpublished opinion, affirmed. We granted writs to consider Avondale's claim for contribution from Dibert, Bancroft & Ross.
On original hearing we held that liability for Jessie Carter's compensation benefits was to be apportioned between Avondale and Dibert, Bancroft & Ross. Upon Dibert, Bancroft & Ross' application for a rehearing, that holding was reconsidered, and we now hold that Avondale is solely liable for the award of workman's compensation to Jessie Carter.
Jessie Carter's duties while at Dibert, Bancroft & Ross consisted of pressing buttons that caused sand from a thirty ton capacity overhead tank to empty into a nine hundred pound capacity hopper. Another button caused the hopper to fill a third vessel, called the muller, with sand. He would add silica flour, bentonite, molgar and water to the muller which would mill the compound. Carter described the hopper as having a closed top except for a two foot opening through which the sand dropped in from the overhead tank. The sand fell a short way down a funnel into the mill. Luther Chavers, who knew Carter only during his last three years at Dibert, Bancroft & Ross and who is presently a general superintendent for Dibert, Bancroft & Ross, described the hopper as having an open top. Carter stated the tank emptied the sand into the hopper through a trapdoor in the *178 bottom of the tank. He said there was little dust at Dibert, Bancroft & Ross because there was not much distance for the sand to fall from the tank into the hopper and from the hopper into the muller. Carter was provided with a respirator after one or two years at Dibert, Bancroft & Ross. According to Chavers, Carter worked eight hours a day and prepared about sixteen batches of the sand mixture per day.
Carter was assigned as a sandmixer helper for his first year at Avondale. He later became a sandmixer and coremaker. The tank at Avondale filled an open top hopper with sand by means of a small pipe. One of Carter's duties during his first two years at Avondale was to stand inside the hopper while sand was flowing from the pipe. As the sand filled the hopper it would accumulate underneath the pipe so as to stop the flow of sand. Carter would shovel the sand away from the pipe so that the hopper could be filled. The hopper had to be inverted in order to dump sand into the muller. Carter said inverting the hopper caused dust to cover everything, and he would inhale it. Carter was provided with a respirator at Avondale, but he said light dust would go through the filter and he would inhale it. Carter testified he worked nine hours a day, five and one-half days a week while at Avondale, but did not know how many batches of sand he made per day. He did say that he made three different types of sand for Avondale while he only made one type at Dibert, Bancroft & Ross.
Carter testified he had been required to undergo a physical examination, that included x-rays, before being hired by Avondale in 1968. He was employed by Avondale without reservation and was never told of any problems discovered by his examination. Those records and reports were not available at trial, and we have no evidence to establish plaintiff's medical condition prior to 1972.
Dr. Morton Brown, a pulmonary specialist, treated Carter since August, 1972. Dr. Chalaire, Carter's family physician, had referred Carter to Brown for a tuberculosis test and x-rays. Dr. Brown testified the x-rays showed lung abnormalities in 1972. Dr. Brown referred plaintiff to Dr. Martin Ziskind for a lung function test, and told him to return in two months. Dr. Brown worked for the New Orleans Health Department Chest Clinic until 1976. He stated the clinic's evaluation was primarily for tuberculosis, and other diseases were not sought out. When Carter returned after two months, Dr. Brown noted the lung function test did show impairment, but he advised plaintiff to continue working.
Plaintiff visited Dr. Brown at the clinic on a yearly basis from 1972 through 1976. Plaintiff's x-rays were stable throughout that time, and he was given tuberculosis tests which showed no change. Plaintiff saw Dr. Brown as a private patient in 1976. Dr. Brown testified he first diagnosed plaintiff's condition as silicosis in September of 1976, but it was nondisabling and plaintiff continued working. In August of 1977 he found plaintiff's condition slowly worsening. Carter was placed in the hospital for evaluation. Plaintiff's condition was found to be disabling, and he did not return to work.
Dr. Brown testified, in response to defense counsel's hypothetical question, that considering Carter's work history, his twenty-eight year employment at Dibert, Bancroft & Ross would have contributed to his development of silicosis. However, Dr. Brown qualified his statement by adding that he could not give an accurate reply because the concentration of dust particles was the key to such a determination. Dr. Brown testified that if the concentration levels at Dibert, Bancroft & Ross and Avondale were equal, then Dibert, Bancroft & Ross would have caused greater damage. However, if the level of concentration was higher at Avondale, then it would have tipped the scales as far as the disability factor. Dr. Brown said he was unaware of the concentration levels to which plaintiff was exposed at Dibert, Bancroft & Ross or Avondale. He did say that Carter had progressive worsening of nodules in his lungs while at Avondale where he made molds for steel products which consisted of molds containing *179 silica. Dr. Brown also testified that silica dust particles are invisible to the naked eye. If one could see dispersed particles in the air, he noted, those were the large particles, which were indicative of a lot of small particles that one could not see. Dr. Brown said silicosis had an induction time of anywhere from eighteen months to twenty years.
Dr. Hans Weill, a pulmonary specialist, gave testimony as to the meaning of reports from medical examinations of plaintiff that were made by Dr. Martin Ziskind, also a pulmonary specialist. (Dr. Ziskind died before trial, necessitating Dr. Weill's testimony). The October, 1977 report indicated Dr. Ziskind found plaintiff to have advanced pulmonary silicosis with simple nodular involvement of both lungs. He also reported that plaintiff suffered from arterial hypoxemia, hypertensive cardiovascular disease and prostatism. Dr. Ziskind noted that the presence of advanced silicosis was an unfavorable sign because it was usually followed by the development of complicated disease in sandblasters, and predisposed plaintiff to mycobacterial infections.
Dr. Weill stated that sandblasters were subject to the highest risk of silicosis because they were exposed to the greatest concentration of silica particles. He said the disease had an induction time of ten to forty years. Dr. Weill doubted that plaintiff's employment at Dibert, Bancroft & Ross played no part in his contraction of silicosis, but testified that the concentration of silica particles was the most important factor in its development. Dr. Weill's opinion was that visible particles meant an even greater concentration of invisible parties. He said that if plaintiff received higher doses of dust at Avondale, then that exposure was the problem, but he did not know of the concentration level at Dibert, Bancroft & Ross or Avondale. Dr. Weill stated that the cotton respirators given to plaintiff by Avondale and Dibert, Bancroft & Ross were inadequate protection against the invisible silica particles.
John Roberts, manager of Avondale's workers' compensation department, testified that he sent plaintiff to Ochsner Foundation Hospital in June of 1977. He received a report from Dr. Emory Brooks which advised him that there was a strong suspicion that Carter had silicosis. Roberts stated he did not advise plaintiff of this finding, and plaintiff continued working for Avondale until August 15, 1977.
The evidence establishes that plaintiff was "... disabled because of the contraction of an occupational disease ..." while employed by Avondale. See R.S. 23:1031.1. Plaintiff timely filed his claim against Avondale within four months of the date the disease manifested itself.[1] He carried *180 his burden of proof and established by a preponderance of the evidence that he was disabled from working, and that the silicosis was occupationally related to his employment at Avondale. Plaintiff is clearly entitled to compensation benefits. See Bates v. Bituminous Casualty Corp., 266 So.2d 556 (La.App.1972).
Avondale seeks contribution from Dibert, Bancroft & Ross on grounds that plaintiff's employment there caused him to develop silicosis. Counsel for Avondale contends that the employer who causes the exposure which results in the disease is liable for compensation, regardless of who employs the claimant when the disease manifests itself. Hanlon v. Sline Industrial Painters, 358 So.2d 700 (La.App.1978), writ refused 360 So.2d 1177 (La.1978); Chivoletto v. Johns-Manville Products Corp., 330 So.2d 295 (La.1976) are cited for this proposition.[2]
In Hanlon the claimant worked for Sline Industrial for five years. Under a contract Sline had with PPG Industries, Hanlon went to work at the PPG plant site. The contract between Sline and PPG required PPG to pay any workers' compensation benefits which may have become due to Hanlon while working at PPG. Hanlon was, in effect, an employee of PPG for the next ten to fifteen years. He was exposed to silica particles throughout this employment. Hanlon finished the job at PPG on June 15, 1975. He did no work until August 15, 1975 when he was sent by Sline to an American Bridge job in Orange, Texas. Three days after Hanlon began sandblasting work he became disabled because of silicosis. The court held PPG solely liable for Hanlon's compensation benefits.
Chivoletto v. Johns-Manville, supra, involved a plaintiff who was employed by Johns-Manville from 1948 through 1970 where he was exposed to asbestos. When Chivoletto became disabled because of asbestosis in 1973, he was employed by Jefferson Parish as a sewerage treatment plant operator. He was not exposed to any asbestos while employed by the Parish of Jefferson. The court held Chivoletto was entitled to an award for permanent partial impairment of lung function. Johns-Manville was held liable for the compensation.
Hanlon and Chivoletto are distinguishable from the case at bar. Hanlon involved a plaintiff who had worked for his employer, Sline, for less than twelve months, and he failed to prove by an "overwhelming preponderance of evidence" that he contracted silicosis during his three day employment with Sline at the American Bridge job. See 23:1031.1D. The evidence clearly established that Hanlon's silicosis was a result of his employment with PPG and not from his three day employment with Sline.
In Chivoletto the plaintiff was awarded compensation benefits against the employer who had caused his exposure to asbestos. Plaintiff had no exposure to asbestos at his job with Jefferson Parish, which was a job totally unrelated to the type of work he performed for Johns-Manville. As in Hanlon, *181 sole liability for compensation was placed on the employer that last exposed the plaintiff to disease producing particles which caused the plaintiff to contract and become disabled by the occupational disease. In Hanlon the plaintiff's last employer was held not liable because of the limitation in R.S. 23:1031.1D. In Chivoletto the last employer was excused from liability for compensation because the plaintiff's asbestosis was not occupationally related to that employment.
The evidence in the case at bar indicates that plaintiff's employment at Dibert, Bancroft & Ross might have played a part in his development of silicosis. However, it was not established by a preponderance of evidence that plaintiff's exposure at Dibert, Bancroft & Ross caused him to contract silicosis and become disabled. Drs. Weill and Brown both testified that the concentration of particles was the determining factor in the contraction of silicosis. They also stated that visible dust particles were indicative of an even greater number of invisible particles. The physicians could not offer opinions as to which job caused plaintiff's silicosis because they did not know the concentration levels to which he was exposed. The only evidence before us is plaintiff's testimony that there was a great deal more dust at Avondale than at Dibert, Bancroft & Ross. Plaintiff's description of the sand mixing process at Avondale corroborates his opinion as to the concentration levels. The higher level of concentration at Avondale suggests that employment was the primary cause of plaintiff's silicosis and disability.
In Fazande v. Continental Grain Co., 363 So.2d 1253 (La.App.1978), plaintiff suffered from an occupational pulmonary disease caused by his employment at a grain elevator. The grain elevator's insurer at the time plaintiff became disabled contended the elevator's previous insurers were liable in solido for plaintiff's compensation. The insurer argued that the inhalation of grain dust amounted to a series of injuries over plaintiff's fifteen year employment by Continental, and that each insurer should contribute for his compensation. The court rejected that argument and held the last insurer liable because it had provided coverage to plaintiff at the time he became disabled and on the last day of exposure. The court found plaintiff's claim was for occupational disease rather than a series of definable accidents.
R.S. 23:1031.1 does not specifically exclude the possibility of contribution by former employers when their working conditions contributed to the occupational disease. Nevertheless, a fair interpretation of 23:1031.1 indicates no intent to depart from the general scheme of the compensation actthe employer at the time of the accidental injury causing disability is responsible for paying compensation benefits. The only departure in 23:1031.1 is subsection D, covering disability from occupational diseases occurring when a worker has been employed for less than twelve months. In that case, the worker must prove by an "overwhelming preponderance of the evidence" that the disease was contracted within the last twelve months in order to establish that the "occupational disease ... shall become compensable." 23:1031.1D.
No provision in 23:1031.1 indicates that employers from years back should share responsibility (for paying compensation benefits) with employers of the worker at the time the disease "manifested itself" and "disabled" the worker. 23:1031.1E. This is consistent with the other provisions of the compensation act, which places responsibility on the employer at the time of the "accidental injury" causing disability, and not on previous employers whose conditions might have made the worker only more susceptible to injury. See Starks v. Hardware Mutual Casualty Co., 231 So.2d 657 (La.App. 1970).
The decision to require contribution from a former employer, whose working conditions might have contributed to the occupational disease which ultimately disables the worker, is a policy decision which is best left to the legislature.
Accordingly, our original decision granting the third party demand is set aside, and *182 there is now judgment in favor of third party defendant Dibert, Bancroft & Ross, Inc. and against Avondale Shipyards, Inc. rejecting Avondale's third party demand, and reinstating the judgments of the lower courts, at Avondale's cost.
LEMMON, J., dissents.
NOTES
[1] The trial court also awarded penalties and attorney's fees, finding that Avondale had arbitrarily failed to pay compensation benefits timely.
[2] Plaintiff did undergo a pre-employment physical, including X-rays, before he began work at Avondale. Although those records were not available, the logical inference is that the examination results were satisfactory.
[3] When there is conflicting evidence, great weight must be accorded to the trier of fact in the proper performance of factfinder's function of weighing evidence and resolving conflicts. In such a case a reviewing court determines sufficiency by viewing the evidence in the light most favorable to the prevailing party and then determining whether the evidence, thus viewed, constitutes a preponderance.
[4] R.S. 23:1031.1 does provide that a disease, although otherwise qualifying under the statute as occupational, is presumed not to have been contracted in the course of the particular employment when the employee has been engaged in work for the particular employer for less than 12 months. This presumption, however, is rebuttable.
[5] Cuppett v. Sheeslly Supply Co., 30 Pa. Cmwlth. 584, 374 A.2d 757 (1977); Morell v. Asarco, 611 S.W.2d 830 (Tenn.1981); Yocom v. Karst, 528 S.W.2d 697 (Ky.App.1975).
[6] The method of apportionment is a difficult issue. Apportionment could be based on the length of time in each employer's service, or on the relative working conditions maintained by each employer, or on an equitable determination by the trier of fact based on all relevant factors.
[1] R.S. 23:1031.1 was amended in 1980 to lengthen the prescriptive period to six months. See Acts 1980, No. 666, Sections 1, 2. Those parts of R.S. 23:1031.1 applicable to this case are:

"A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
B. An occupational disease shall mean only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease.
. . . . .
D. Any occupational disease as herein listed contracted by an employee while performing work for a particular employer in which he has been engaged for less than twelve months shall be presumed to be non-occupational and not to have been contracted in the course of and arising out of such employment, provided, however, that any such occupational disease so contracted within the twelve months' limitation as set out herein shall become compensable when the occupational disease shall have been proved to have been contracted during the course of the prior twelve months' employment by an overwhelming preponderance of evidence.
E. All claims for disablement arising from an occupational disease are forever barred unless the employee files a claim with his employer within four months of the date of his contraction of the disease or within four months of the date that the disease first manifested itself. Notice filed with the compensation insurer of such employer shall constitute a claim as required herein.
F. All claims for death arising from an occupational disease are forever barred unless the dependent or dependents as set out herein file a claim with the deceased's employer within six months of the date of death of such employee. Notice filed with the compensation insurer of such employer shall constitute a claim as required herein.
G. Compensation shall not be payable hereunder to an employee or his dependents on account of disability or death arising from disease suffered by an employee who, at the time of entering into the employment from which the disease is claimed to have resulted, shall have willfully and falsely represented himself as not having previously suffered from such disease.
H. The rights and remedies herein granted to an employee or his dependent on account of an occupational disease for which he is entitled to compensation under this Chapter shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents or relatives."
[2] Counsel for Avondale also relies on Lachney v. Employers Commercial Union Insurance Companies, 337 So.2d 624 (La.App.1976) and Scott v. Hartford Accident & Indemnity Co., 302 So.2d 641 (La.App.1974). Those cases are inapplicable because each dealt with distinct work related accidents that caused back pain and led to disabling back conditions. The issues in this case are governed by the occupational disease law, R.S. 23:1031.1.